May it please the Court, I'm Maggie Hall on behalf of the Environmental Organizations. I'll plan to reserve three minutes for rebuttal. Watch my time. The Forest Service approved a project that allows cutting trees and mastication of chaparral in the Los Padres National Forest on Pine Mountain and its highest point, Rays Peak. This area is not only sacred to Native American tribes because of its religious and cultural sites, it also contains a specially protected roadless area as well as potential wilderness. Yet the Forest Service determined the project should be excluded from standard environmental review. I will address why the agency's reliance on categorical exclusions violates the National Environmental Policy Act and cannot be justified under the Healthy Forest Restoration Act. Aside from these environmental review violations, I will also address why the agency's approval of logging large trees under the project's exceptions violates the roadless rule. Now turning first to NEPA, categorical exclusions can only be used where there are no significant impacts and extraordinary circumstances do not exist. Now importantly, if there is uncertainty whether there are significant impacts, a categorical exclusion is improper. Here the agency ignored evidence in the record showing the potential for significant impacts to three of the resource conditions that it must consider. And importantly, this is not a situation where the agency analyzed these impacts and explained why they are insignificant. Instead, in all three of these situations, the agency has entirely failed to consider an important aspect of the problem, and that violates a core requirement of administrative law. First, with respect to cultural and religious sites, the analysis in the decision memo is one sentence, and it concludes that there are no Native American religious and cultural sites. Now that directly contradicts the record. For example, the Barbaraino-Venturaino Band of Mission Indians identified Rays Peak itself as a well-known central observation point saturated with cultural and ceremonial significance. Eleven ethno-historians and archaeologists cited field notes that document Chumash trails and trail shrines directly in the project area. And the Coastal Band of the Chumash Nation pointed to evidence of medicinal plants and grinding bowls. Now all of these comments... Of evidence of what? Medicinal plants and grinding bowls. Now all of these comments were in front of the Forest Service at the time they made their decision, and they simply did not even recognize them. Boy, there was a cultural resources report issued by the Forest Service, wasn't it? Correctly, Your Honor. However, that report was not created to look at cultural sites as required by the agency's regulation. Instead, and it was also not part of the agency's rationale in its decision memo, the report itself states that it was prepared to implement the National Historic Preservation Act, and so therefore it focuses on historic properties. And even looking at the report, it does not cure the deficiencies here because it provides no analysis of the sites identified in the record. Well, these tribes, though, identified no specific cultural... There wasn't a burial mound or anything specific found, was there, within this project? There were specific sites identified in the record, and some of those are ones I just mentioned, such as Ray's Peak itself. Well, but the peak itself, I mean, you can't say the whole, well, but what damage was done to the peak? I mean, that's just a place of reverence, but okay, so what? Your Honor, the language of the regulation uses the term cultural sites. And importantly, looking to this Court's decision in Timoac Tribe versus Department of Interior, the Court was looking at cultural resources and explained that a tribe's relationship to an area is inextricably linked to the landscape. And that case concerned tops of mountains, and that's what we have here, the top of a mountain that, as the record states, is saturated with ceremonial and cultural significance. But importantly, the agency did not even attempt to analyze impacts to the peak. It didn't say we've looked at Ray's Peak in light of these comments and we determined there are no significance. It entirely failed to consider that problem. Well, wait, the whole purpose of this project, right, was to reduce the likelihood of a massive forest fire or worry about insect infestation. Isn't that the purpose of the project? Your Honor, the purpose of the project is not relevant to whether the agency needs to analyze the impacts of its project as required by NEPA before it can proceed. And here it did merely a categorical exclusion. It did not even prepare an environmental assessment or an environmental impact statement. Well, which it doesn't have to do unless there are extraordinary circumstances. That's correct. And here the evidence, the agency simply said there are no cultural sites, and that directly contradicts the record which points to cultural sites. Now, one of the reasons the agency argues its analysis was adequate or suggests so is because of the source of those sites. But here it's important this source of tribes being recognized or non-federally recognized is not a reason to ignore them. And that's because each of the tribes — Consult with both federally recognized and non-federally recognized tribes in preparing the cultural resource report that made many recommendations for preserving what sacred sites there were. Your Honor, there is an indication of conversations with such tribes, but there is nothing in the record that shows the agency even considered the specific sites that the tribes identified in their scoping comments. Well, they did look for, like, these grinding bowls and couldn't find any, could they? Importantly, Your Honor, the cultural resources report was not part of the agency's rationale on the specific question it had to look at under 36 CFR 220.6B16. Instead, that report was prepared for subsection 7, which looks at a different type of sites. And the important point here is the agency has to explain the reason for its decision at the time that it makes it. There's also a deficiency with respect to the rowless area. Now, 41 percent of the project is within an inventoried rowless area, but the Forest Service dismissed impacts to this area relying entirely on the assumption that no large trees will be removed. However, the project contains broad exceptions that in fact allow for the removal of large trees. Now, trees 24 to 64 inches in diameter can be removed for safety reasons, dwarf mistletoe infestation, and for overall forest health. Yet there is no definition of these exceptions or any limits on how often they can be used. Well, I've got a question. In the decision memo, there's a quote, no trees in the greater than 24-inch diameter classes are planned to be removed. And it says the direct effects of the project to the rowless area as a whole is extremely minimal, impacting only 0.29 percent of the rowless area. Now, doesn't that take into some of these concerns of yours? No, Your Honor, because on the one hand, they say no trees greater than 24 inches will be removed. But then they have a broad open-ended exception that allows for trees to be removed up to 64 inches in diameter. But there's never an explanation of what the impact of those tree removals will be. Now, during litigation, the agency points to a post hoc declaration of Forester Gregory Thompson to argue that few large trees will be removed. But that declaration was not before the agency at the time it made its decision and is therefore prohibited under the APA. The basic rule is clear. An agency has to defend its actions based on the time it gave when it acted. And the Forest Service tries to argue on that or rely on that post hoc declaration arguing that it's explanatory in nature. But importantly, this Court has made clear that consideration of post hoc evidence cannot be used to determine the correctness or wisdom of the agency's decision, which is what counsel urges this Court to do here. Now, finally, turning to the potential wilderness issue, the decision memo dismisses with this issue in one sentence. It says, no potential wilderness areas are identified within the forest plan for the project area. But the correct question is whether there's potential wilderness in the project area. And the answer to that is yes for two reasons. First, the project area includes a roadless area. And as this Court has noted in Lands Council v. Martin, roadless areas are significant because of their, quote, potential for designation as wilderness areas. And this makes sense because, by definition, these areas share many of the same attributes. Well, in the sense that they may have a necessary but not necessarily a sufficient condition to be potential wilderness. That's correct, Your Honor. So it doesn't have to be designated wilderness. It just has to be potential wilderness. And what that term means here, we're pointing to two reasons why that's met. One is because, as this Court has recognized, there is an overlapping nature between a roadless area and its potential for wilderness designation. And it's also illuminating here that there is pending legislation seeking to designate approximately 34 percent. Why does that have any relevance? How can a legislative determination made by one house be given any weight? Because we're looking, again, at potential wilderness, not an actual wilderness designation. But how do you define potential wilderness in this context? The term is not specifically defined here. And so we're pointing to two sources that are instructive, the Court's reasoning in Lance Counsel v. Martin, as well as the fact that there's pending legislation. And the district court in Idaho addressed exactly this situation in Wildlands Defense v. Bolling, where there was an area proposed for wilderness designation. Under the Constitution, the House is not given any role in making administrative determinations about what constitutes wilderness. And the fact that a member of Congress introduces a bill and has a view that the law should be changed to do this, how can that be given any weight at all? Your Honor, if the question were whether it was designated wilderness, then, of course, that shouldn't be given weight. But it's just whether there's potential wilderness. And, again, looking at both of these scenarios, we have a roadless area. The overlapping area with the roadless area is generally what would be the potential wilderness area. And those areas share many of the same ecological attributes. What's your definition of a potential wilderness area? What is it? What are the elements of it? Your Honor, we don't have specific elements that would be supported by case law, other than looking at the plain language reading. Is this area potentially on the table for designation? Of course, not any area is going to be potential wilderness. But, again, the reasoning in Lance Counsel v. Martin from the Ninth Circuit, the court really looked at the ecological attributes of a roadless area and how those overlap with potential wilderness designation and found that an agency's failure to look at that made it for improper analysis of impacts to the roadless area under the environmental impact statement. Now, any one of these deficiencies is enough to show that there may be significant impacts, and that's all that's needed to require additional analysis. Now, turning to HFRA, these statutory categorical exclusions are limited to a set of four circumstances, and the Forest Service has failed to meet three of them here. First, it did not rationally explain how the project will maximize the retention of both old growth and large trees. The agency entirely omitted an analysis of whether old growth even exists in the project area. Now, the agency has defined that term as consisting of certain ecological attributes such as canopy layers, variety in tree size, and dead and woody material, yet it never addressed whether those attributes even exist here. Instead, the decision memo simply points to tree size. That's just one consideration in assessing old growth, and HFRA explicitly requires consideration of both old growth and large trees. And several of this court's cases, although unpublished, show that the Forest Service knows how to do this. In these cases, it identified where old growth existed in the project area and then explained how it would be addressed. Now, contrary to the Forest Service's argument, plaintiffs did not forfeit this issue. In addition, the analysis regarding large trees is arbitrary and capricious. Now, this analysis rests entirely on the assumption that no large trees will be removed, but as I've already discussed, this project authorizes the removal of large trees under its broad exceptions, and the agency cannot fill the gap in its analysis by relying on a post hoc declaration. Second, I'll turn to the location requirements under HFRA. While the agency admits that 12% of the project is not covered by HFRA, it fails to show how the remaining 88% of the project meets HFRA's location requirements. Does that have to meet the location requirement if it's a categorical exclusion under CE6? Your Honor, those are distinct. I know, but can the CE6 exclusion stand alone without regard of HFRA? Yes, because CE6 covers the whole project area, whereas HFRA covers 88% of the project, and the agency chose to rely on all three exclusions. I guess I just want to be clear. If that means if we decided that the district court was correct that CE6, the regulatory exclusion exempts because there were no extraordinary circumstances, we don't even have to reach these HFRA issues, do we? Well, the important question is whether there were extraordinary circumstances. Oh, I understand, but I'm just saying assuming we decided there were none and CE6 covers it, then we don't even get to the HFRA categorical exclusions, do we? That may be correct, Your Honor, but there would also be the roadless rule issue as well. Oh, okay, right. Yes. So regarding these location requirements, this location requirement was not met here, and I like to think of them as a Venn diagram where you have the specific vegetation classes on one hand and then the fire regime groups on the other, and it's only that area of overlap in the middle that's even subject to HFRA, and the agency simply showed us information regarding these separate categories but made no effort to show us how it meets the HFRA requirement or connect the dots. Now, importantly, the Forest Service has to show its work, connect the dots, and it didn't do that here. It also failed to meet the HFRA location requirement regarding Chaparral, and that's a 272-acre portion of the project where the agency concluded that Chaparral meets fire regime group 1 when its own decision memo makes clear that on its facts it actually meets fire regime group 4, which does not qualify for HFRA. Sotomayor, did you raise that argument below? Yes, Your Honor. We did raise that argument below and have therefore not forfeited it. I can point to a couple of citations in our comments in the complaint as well as briefs at the lower court, and that's at SBR 039. And here, there's a — basically, it seemed to appear — appears to be a critical error that the agency simply just didn't correct. It simply matched up the HFRA location requirement concerning Chaparral to the wrong group number, and for whatever reason, that error was not corrected. So there's an entire disconnect between the facts and the conclusion. Now, finally, this project was also not developed through a collaborative process. All essential components of the project were developed through the project proposal, and it wasn't until scoping began that the Forest Service reached out to a variety of stakeholders, including conservation groups, non-recognized tribes, states, and local entities. But by that time, the project was already developed, and the opportunity to participate in the scoping process, importantly, is not a replacement for the requirement to participate in the project's development as expressly required under the statutory language of HFRA. Now, turning to the roadless rule, this prohibits logging in inventory roadless areas except for generally small-diameter trees. Now, the Forest Service has defined what's generally small-diameter here as trees under 24 inches. Large trees are trees that are over 24 inches, but the project allows for the removal of trees as large as 64 inches in diameter, and there's no reading of generally small-diameter trees that would warrant logging trees so large. This plainly violates the roadless rule, and the agency cannot circumvent that violation with its post-hoc declaration. Finally, with respect to remedy, the project should be vacated and remanded to the Forest Service with instructions to comply with NEPA, HFRA, and the roadless rule. I'd like to reserve the remaining time for rebuttal. All right. Thank you, counsel. Good morning. May it please the Court. Andrew Birney on behalf of the Forest Service. I guess I'll just spare an introduction and dive right into the issues on CE-6 in particular, because, Judge Gilman, you're right. If you find that the Forest Service properly invoked CE-6, there's no need to reach the HFRA conclusion. So turning first to the issue of religious and cultural sites, I'll just talk briefly about what the Forest Service did, and then I'll talk about the comments that plaintiffs invoked. So if you look at the cultural resources report beginning on page 86 of the excerpt of the record, I think it's fair to say that the Forest Service analysis of this issue was, by any standard, quite robust. What's your response to her comment that there's no indication in the decision here that that report was relied upon? I think that's simply not right, Your Honor. I mean, if you look at the — Is that what's covered in the so-called heritage section, the adoption of the recommendations from the cultural — I think that's right. I mean, if you look at the recommendations in the heritage section on page — Why was it called heritage there, and yet what was really being examined was the religious and cultural? I just — I mean, the agency used that word. How do we know that it connects back to — Well, I mean, I think, first of all, I mean, we'll think — I think heritage, cultural, I think they're sort of — they're analytically quite similar, but — Religious or spiritual meaning. Well, I think the other point, Judge Wardlaw, is the recommendations of — in that section, track the recommendations in the cultural resources report that if unanticipated resources are uncovered — It doesn't expressly say that, right? It doesn't expressly say that there, but if you look at page — I think if you look at page 57, it says, based on discussions with federally recognized tribes and agency research and analysis, I think it's — I mean, the whole point of this cultural resources report was to identify cultural and religious resources that might be affected by the project. And it's expressly referred to in the next paragraph, B17. So the whole point of this report was to look into these issues. And if you look at that report, so beginning on page — so it starts with an archaeologist looking at prehistoric and historic uses. Then it goes into tribal consultations. I'm curious why the agency said there's no cultural resource impact without saying, provided we follow the recommendations in the cultural resource study. I think it says — I don't have a site, but I think it says elsewhere that if the recommendations followed in that report are followed, there will be no impacts if the mitigation measures — I think that's on page. I'd like a site to that, yeah. What's that? It would be helpful to have an ER site to that. Yeah, I don't have one on the top of my head. I can certainly provide one in the 28J, but I think it's somewhere in the record. But the point is that in that report, the Forest Service looked at these issues in detail, conducted a record search, literature review. It looked at field surveys that have been done in terms of review for eight similar projects that have occurred within a half-mile of the project area. In terms of field surveys, another archaeologist looked at that. And as a result of that, it identified eight cultural sites within the vicinity of the project, five in the project area, and imposed mitigation measures. So I think if plaintiffs are going to demonstrate that we acted arbitrarily and capriciously in finding no extraordinary circumstances in the form of religious and cultural sites that would be adversely affected by the project, they have to identify specific things that our comprehensive review missed. And they just don't do that. So, for example, my friend on the other side talked about grinding bowls. As they note, the cultural resources report identified potential grinding bowls in one site, noting that more recent searches have failed to locate those grinding bowls and that a search for them would occur before project implementation, but no others. And so if you look at the comment plaintiff site, this is on ER 234, it just says we have evidence of grinding bowls, but there's no location, there's no information about location, where they are, no information provided to the Forest Service. Plaintiffs also point to medicinal plants, but there's also, putting aside that we don't think the mere presence of medicinal plants makes something a religious or cultural site, there's no information about location, no discussion, I think it was Judge Gilman made the point, no discussion about how this project, which is intended to improve the ecology of the area, would adversely affect those resources. So when we've done a study like this, it's their obligation to come forth with specific sites that we might have missed. They didn't do that, even though they could, and they still could. I mean, the cultural resources report, this is on page 97 of that report, and that's incorporated into the decision memo at page 65, says that if unidentified sites are discovered, work in the area will immediately stop, stop while an archaeologist assesses the situation. But in order to render arbitrary and capricious the Forest Service's careful study of this project, it's just not enough to gesture vaguely to grinding bowls, medicinal plants, without providing any information about how the agency smells. When is this project scheduled to begin? There's no set date. My understanding is implementation, this isn't in the record, but my understanding is that implementation is about a year away. So, I mean, there's no sort of mootness problem, and that's what the Court is concerned about. And, you know, counsel referenced the Timok case, but in that case you had specific submissions of maps, ethnographic studies, and two of the sites were eventually added to the National Register of Historic Places. Here we have nothing like that. I mean, the letters here are quite conclusory and for the most part just object to forest management in the area, and that's just not enough to render what we did arbitrary and capricious. I want to talk about effects to roadless areas. The project does not contemplate removal of larger trees. The entire point of the project is to allow, or one of the points of the project at least, is to protect larger trees so that they can have greater access to water to fight off pest infestations. We say in the record at page 55 that no large trees are contemplated to be removed, and then the Forest Service said at page 49 of the record that any incidental removal of large trees would not have any significant environmental effects. Is there anything in the administrative record about what the impact of that exception would be?  So a couple things. So as I just said, the Forest Service found at page 49 that any incidental removal would not have significant impacts. These are not, Judge Collins, contrary to my colleague, my friend on the other side's characterization, these are not broad exceptions. These are narrow sort of emergency safety exceptions for public safety or dwarf mistletoe infestations. This is just common sense that if the Forest Service, for it to safely complete a project, it has to have the ability to remove hazard trees. So these aren't broad exceptions. In terms of the Thompson Declaration, we don't think that you need to consider that, because it's clear from the record that the Forest Service doesn't contemplate removing any specific trees and that any incidental removal would not have broad impacts. But that just underscores the point. I mean, what Mr. Thompson says in that declaration is most of the problem areas for hazard trees are on roads or on campgrounds where we've already done hazard tree removal over the past 20 years. And he also makes a point that I think is important in understanding the record. You know, we can't say in advance, this is on page, I think, 63 of the Supplemental Experts, we can't say in advance exactly which large trees we're going to remove, because what contractors will do is if they can avoid a hazard tree without removing it, we'll do that. But these are very narrow exceptions and certainly not the sort of extraordinary circumstance that prevents resort to this exception. I want to talk briefly about wilderness. So what Plaintiffs' Counsel said is there's only one sentence in the decision memo on page 53 that says there's no potential wilderness. Ginsburg. What's the agency's interpretation of what a potential wilderness is? So for potential so I'm not so I'm not sure there's there's any I'm not sure there's any definitive regulatory definition, Your Honor. I think as a matter of practice, this is I believe in Forest Service documents, the Forest Service generally looks at availability, capability as well as as well as need in terms of whether it's needed as a wilderness resource. So here so there is just that one sentence of in the decision memo, but the Forest Service looked at this for this land already when it established the land management plan for the Southern California Forest Management Plan. I think that was in 2005, and it looked at it again in 2014. And what it concluded, and this is recounted in page 108 of the excerpts of record, is that this area is is is it does not have good value as wilderness, and also that it's not needed as wilderness because there are 850,000 acres near within 20 miles of the project that are little used. But so the forest but the point is that the Forest Service already looked at this. This isn't specifically challenged here, and it didn't have to, I think, revisit that analysis when it already looked at it once and reaffirmed it and reaffirmed it more recently. Judge Collins, I mean, I think you're absolutely right that the that the unenacted bill that was passed the House and was not taken up by the Senate has no bearing on this. I mean, to be clear, if there had been something like specific in the legislative record that if that that plaintiff said we we we should have looked at but didn't, you know, that's that's that's fair game, I suppose. But they don't say that. They just say that the mere existence. Do you agree that if the bill it had recitals that laid out like specific facts as to why it should be potentially wilderness, that those facts would need to be considered to the extent that they were relevant. They might be relevant. Yeah, I think probably that's right. I mean, it depends on how persuasive the facts is. I don't think the given that the Forest Service looked at this. I don't think that I don't want to say as a government lawyer that if that if they hadn't hadn't specifically addressed it, that would have necessarily made it arbitrary and capricious. But certainly a plaintiff could rely on those findings and the extent that they weren't addressed as an argument for why the agency's action was arbitrary and capricious. But I mean, the idea that just the mere existence of this unenacted bill renders the Forest Service's determination arbitrary and capricious when it already looked at this and reached well-reasoned determinations that this isn't suitable for potential wilderness is, I think. Whatever that is. Fair enough, Your Honor. So just we so we don't think you need to reach the HFRA exclusions given we think C-6 plainly applies. I do want to just make a couple observations in response to my opposing counsels. Can I just follow up? Sure. Is there do we need to rely on our deference for you to prevail on that potential wilderness issue? No, no, no, no, Your Honor. I mean, I don't think I don't I don't because. Because it's already being considered. Yeah. Because it's already being considered. I don't think you need to rely on it because I don't think plaintiffs fairly read in their briefs are challenging the agency's analysis of this issue in 2014 at all or making any specific challenges arbitrary and capricious. So in a different case, that might be an issue, but I don't think the sort of rigor of the agency's analysis of that question is an issue in this case. I don't think that the standard of review is presented here. If I could just move briefly to the HFRA exclusions. I mean, on old growth, so the Silva Cultural Report says that the oldest tree found was 120 years old. This is, I think, on page 82 of the excerpts of record, which is relatively young growth for the species, which is about 400 to 500 years. Now, we have argued in our brief that plaintiffs forfeited the argument that we didn't shout about issues of old growth apart from large trees. Certainly neither we nor the district court understood them to be making any arguments about that. But I think the issue, I think it's sort of beside the point, actually, because I think the issue of forfeiture and the merits basically amount to the same thing. If you look at their reply brief in this case on page 18 or look at their reply brief in the district court on SCR 89 is the relevant pages, all of their arguments that there is older old growth than that 120-year-old tree amount to a claim that there are larger trees that we didn't core. So, like, no matter how you look at it, their argument that we didn't specifically maximize old growth is part and parcel of their claim with larger trees, which are protected from removal by this process. I mean, their argument to the contrary is just about this narrow exception, which I think that I've already addressed. On the location issue, I just want to emphasize one thing. So the Forest Service found that 88 percent of this fell within HFRA categorical exclusions because they were in vegetation classes 2 and 3. That's not disputed. So that part is so the location argument they make that we didn't also show that the area within vegetation class 2 and 3 is also within fire regime groups 1, 2, and 3, that argument they are making only implicates at most 10.69 acres, only about 10.69 acres of the entire project is within fire regime group 4 or 5. This argument they're making about Chaparral, in fact, being within fire regime group 4, I mean, I don't — I can't really add to the — what I said. I mean, this argument, in our view, is clearly forfeited. Yes, there's a line in it in the complaint. This wasn't briefed at all. My friend on the other side referenced SCR 38 to — I think SCR 38 to 39. If you look at that, there is not even a reference to Chaparral or to fire regime group 5. There's nothing in that that put them on — that put us on notice that they were actually claiming that the 316 acres of Chaparral in this project are actually part of fire regime group 4. So this argument is just plainly forfeited. It wasn't part of this case at all in the district court. What about — what's your response to their — what I take to be their argument that it's apparent from the record that it's not in group 4? I mean, it's certainly not apparent from the record. I mean, I don't think it's apparent from the record, but it's also not the sort of purely — it's a fact-bound question. It's not the sort of purely legal issue that this — that this — that I think this Court would ordinarily reach out and decide in the first instance when it wasn't briefed at all below and when the district court didn't address it at all. On the roadless rule, I mean, the only thing I'll say about that is the question of generally small-diameter timber. Judge Wardlaw, I know you were on the panel in the Takuya Ridge case. I think that case is all but dispositive. I mean, it's unpublished, so it's not binding. But in terms of persuasive authority, I think it is dispositive here. I mean, in that case, you had trees being logged up to 21 inches. Here you have up to 24 inches. But in that case, it was 60 by 90-inch DBH. Here it's — here the growth range is 80 to 117-inch. And the overall tree — the preexisting tree size in the area is also larger. So I think that really just follows on all fours from that case. And as for the quest — as for the issue about whether we're actually logging this exception, this public safety exception, I think I've said enough about that. With my time remaining, I just want to briefly touch on the question of vacater. We don't think the Court needs to reach this issue, obviously. But, I mean, it's apparent that even if the Court were to find fault with some of this, with the agency's analysis in some respect, for example, that the explanation in the Thompson Declaration should have been in the record itself, arguments along those lines, we don't think that that's correct. But in any event, this is — these are — these are asserted errors that the agency could easily correct in any — in any remand. And I think that that gets at the broader theme of this project, which is this is an environmentally friendly and an environmentally necessary project. The project area is at very high risk of catastrophic wildfires that pose severe dangers for human life, property, natural resources if they've occurred. It was identified more than a decade ago as at high risk of pest infestations. I mean, notwithstanding the clear need for the project, the project itself is quite narrow. It's only 755 acres. It doesn't involve any wilderness, doesn't involve construction of any roads, and applies to just 0.3 percent of the roadless — of the relevant roadless area. The Forest Service nonetheless performed extensive analysis in the decision memo and in the Cultural Resources Report, the Silver Cultural Report, other analysis. So this is a — this is a much-needed project, and if there are no other questions, we would ask the Court to affirm the district court's judgment. All right. Thank you, counsel. Ms. Hall. I have three brief points on rebuttal. First of all, I'd like to direct the Court's attention to 2ER57. That's the decision memo's analysis on cultural sites. The decision memo states that there are no cultural sites in the project area. It does not say we have determined that impacts to cultural sites are insignificant. But it does have that heritage section which adopts the recommendations of the Cultural Resources Report. That's — I mean, there is an inference you can draw here that that minimizes — or it shows that they considered this and they're taking steps to make sure there's no impact. So, yes, Your Honor, it does cite to that, but the important point here is the agency said there are no sites, and now during litigation for the first time saying that in their Cultural Resources Report they identified such sites. But as far as we can tell, the reason it created the heritage resource inventory was pursuant to a separate law, the National Historic Preservation Act. And that's in the very language of the Cultural Resources Report. That looks at a very different set of types of resources. And importantly, it does not look at the cultural sites in the record, such as the trail shrines that were identified by the ethno-historians, as well as Rays Peak itself. The — those documents are completely silent. And so when the agency has not considered an important aspect of the problem, that renders it arbitrary and capricious. I'd also like to address the government's argument that it analyzed the impact of removing large trees. Its analysis at page 49 of the decision memo is one sentence. And that kind of a summary dismissal of impacts is not enough. In fact, these exceptions are much broader. They include not only the removal for safety and dwarf mistletoe infestations. There's also an opener for overall forest health. And that these determinations are made on a case-by-case basis. But there's no language defining any of those terms. And there's really no operative language in the decision memo that would prevent the Forest Service from cutting down, say, half the trees in the project area. I'd also like to address briefly the roadless rule. Now, the Takaya Ridge case has no bearing here. And that's because plaintiffs are arguing that the removal of trees up to 64 inches in diameter is well above removal of trees that are generally small diameter. And 21 inches is a far cry from that — what's going on in this case. Thank you very much. All right. Thank you, Counsel. Los Padres Forest Watch v. The USFS is submitted. And this session of the court is adjourned for today. Thank you, Counsel. All rise.
judges: Gilman, WARDLAW, COLLINS